IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| LISA M. STITZER, ) | Case No. 07 C 50218 |
| ) | |
| Plaintiff, ) | |
| vs. ) | Magistrate Judge |
| ) | P. Michael Mahoney |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

Lisa Stitzer seeks judicial review of the Social Security Administration Commissioner's

decision to deny her application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act.  *See* 42 U.S.C. § 405(g).  This matter is before the magistrate judge pursuant

to the consent of both parties, filed on February 15, 2008.  *See* 28 U.S.C. § 636(c); Fed. R. Civ.

P. 73.

### II.    Administrative Proceedings

Claimant first filed for disability insurance benefits on April 21, 2000 alleging a

disability onset date of September 30, 1999 (Tr. 149).  Her claim was denied initially and upon

reconsideration (Tr. 111, 118).  A hearing before an ALJ was held on May 1, 2002, at which

Claimant was represented by an attorney (Tr. 31, 131).  Claimant, her husband, and a vocational

expert, Mr. Yep, testified (Tr. 39, 87, 94).  On November 29, 2002, the ALJ issued a written

opinion finding Claimant not entitled to DIB (Tr. 28).  The appeals council denied Claimant's

request for review on May 22, 2003, rendering the ALJ's decision the final decision of the Commissioner (Tr. 6).

On June 25, 2004, this court remanded the case back to the Commissioner for further proceedings (Tr. 599). *Stitzer v. Barnhart*, No. 03-C50275, at 8–24 (N.D. Ill. June 24, 2004) (published in the administrative record on pages 564–99) (hereinafter "2004 Order"). Specifically, this court "recommend[ed] the ALJ determine whether Plaintiff's petit mal seizures qualify her for disability at Step Three, and if not, this court recommend[ed] the ALJ consider establishing a new RFC." (Tr. 599). The ALJ held a second hearing on February 6, 2006, at which Claimant was again represented by counsel (Tr. 761). At this hearing, Claimant, her daughter, and Mr. Yep testified (Tr. 776, 803, 810). In a decision dated June 28, 2006, the ALJ again found that Claimant did not qualify for DIB (Tr. 562). The appeals council declined to review the decision, and the ALJ's decision became the final decision of the Commissioner on October 10, 2007 (Tr. 534).

For the sake of brevity, the background and evidence described in the 2004 Order is hereby incorporated. Any evidence repeated in this Opinion from the 2004 Order is done so for emphasis.

## III.    Background

Claimant was born on June 9, 1962, making her 43 years old at the time of the second hearing (Tr. 149, 776). She graduated high school, but testified she could only write simple statements and do simple mathematics (Tr. 46–47). At the first hearing, Claimant testified that she did not drive because of her seizure disorder (Tr. 48). By the time of the second hearing, Claimant testified that she had resumed driving, albeit infrequently (Tr. 778, 805). She also

testified that she rarely ever leaves the house alone, and that she does her shopping with her daughter (she used to shop with her husband, but he moved to Pennsylvania for work in December 2005) (Tr. 806, 809). Claimant said that she uses the computer about once per day for an hour to visit a support site for arteriovenous malformation ("AVM") survivors, to check email, and sometimes to shop (Tr. 59, 789–90). She testified that she does light housework, but not every day and for not more than 15 minutes at a time (Tr. 790).

From May 1984 to January 1993, Claimant worked as a transportation clerk at an electronic distributor (Tr. 175). Her duties included customer service, computer entry, filing, and other office work (Tr. 176). From January 1993 to July 1996, Claimant worked as a traffic import coordinator for Ocean Shipping Company, where she completed computer entry, created reports, engaged in customer service, and did other general office work (Tr. 175, 177). From September 1996 to January 1998, she did general office work for a temp agency, and from February 1998 to September 1999, she was employed as a home care worker, where she spent the entire weekend (48 hours) providing living assistance to another woman (Tr. 51–52, 179).

## IV.    Medical Evidence

In September 1999, Claimant was in a car accident after suffering a seizure while driving (Tr. 306). Doctors determined that the seizure was mostly likely caused by an AVM (specifically, a arteriovenous fistula)[1] (Tr. 306, 309). On October 5, 1999, Claimant underwent two glue injections to decrease the flow to the fistula (Tr. 314). The fistula persisted, though, and Claimant underwent a craniotomy and occlusion of the fistula on November 18, 1999 (Tr.

---

[1]"An arteriovenous fistula is an abnormal channel between an artery and a vein." Arteriovenous Fistula, http://www.merck.com/mmhe/sec03/ch036/ch036e.html (last visited Dec. 31, 2008).

295).  Claimant had a final surgery on November 30, 1999 to complete the occlusion of the

fistula, after which Dr. Ausman, a neurologist at the UIC Hospital, described the fistula as

"completely obliterated" (Tr. 235, 267).  He also started her on Neurontin for anxiety problems[2]

(Tr. 233).

In mid-February 2000, Claimant suffered an episode of numbness involving the right side

of her nose, the right side of her cheek, and her right hand (Tr. 232).  The episode was solitary

and lasted only 15 minutes (Tr. 232).  Claimant underwent an EEG which showed "sharp wave

activity in the left frontal region that indicate[d] the presence of a focus of cortical

hyperexcitability but is not necessarily diagnostic of epilepsy."  (Tr. 231).  The EEG required

clinical correlation for a diagnosis of epilepsy (Tr. 231).  Her prescription for Neurontin was

increased, and she was advised not to drive (Tr. 230).

On May 19, 2000, Claimant's husband and daughter both filled out Seizure Description

Forms regarding Claimant's seizure symptoms (Tr. 207, 208).  The daughter's form was not

copied well and is almost completely illegible (Tr. 208).  The husband wrote that he witnessed

seven seizures from November 1999 to March 2000, occurring both during the daytime and at

night (Tr. 207).  He described that sometimes she would lose consciousness, and jerk and thrash

(Tr. 207).  He also described her as very tired and disoriented after a seizure (Tr. 207).

On May 30, 2000, Dr. Ausman filled out a neurological report and an epilepsy report for

the Bureau of Disability Determination Services (Tr. 209–12).  In the neurological report, Dr.

Ausman noted that Claimant had a seizure disorder (Tr. 210).  He further wrote, "Last seizure, 4-

_____

[2]Neurontin is also an anti-epileptic medication.  Neurontin, Drugs.com,
http://www.drugs.com/neurontin.html (last visited Jan. 27, 2009).

4

00. EEG positive[,] 4-29-00." (Tr. 210). Also in the report, Dr. Ausman noted that Claimant had normal movement in her upper and lower extremities, and no ataxia, atrophy, or tremors (Tr. 209). Dr. Ausman described Claimant's gait as normal, including her ambulation (Tr. 209). He wrote that she was unrestricted in gross and fine manipulation, and that she was properly oriented and alert (Tr. 210).

On the epilepsy report, Dr. Ausman wrote that the EEG showed left frontal sharp waves, and that Claimant had been placed on Neurontin which she took as prescribed (Tr. 211). He noted that seizures occurred once or twice a month and consisted of numbness in the face and disorientation, but that he had never witnessed one (Tr. 211–12).

On June 12, 2000, Claimant visited Dr. Bielkus, a neurologist, upon referral for an evaluation regarding treatment of her seizure disorder (Tr. 444). Dr. Bielkus described Claimant as suffering from a seizure disorder status post AVM resection, and recommended she begin to take Depakote while remaining on Neurontin (Tr. 444). Claimant returned to Dr. Bielkus on July 12, 2000 for a follow-up visit, upon which Dr. Bielkus reported that she was stable on the prescribed medications and had not suffered any seizures in the preceding month (Tr. 443).

On September 15, 2000, Dr. Vincent, a consultant for the Disability Determination Services, filled out a physical residual functional capacity assessment form (Tr. 213–19). The only limitation assessed by Dr. Vincent was that Claimant should avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 217).

Claimant returned to Dr. Bielkus on October 11, 2000 for a second follow-up (Tr. 442). Dr. Bielkus again reported that Claimant was stable on her medication and had not suffered any seizures since her last visit (Tr. 442). Her Neurontin dosage had been reduced and she was

feeling less fatigued (Tr. 442).  Dr. Bielkus recommended that she  attempt to reduce her

Neurontin dosage again (Tr. 442).

On December 20, 2000, Dr. Bielkus filled out a Stroke Residual Functional Capacity

Questionnaire for the Disability Determination Services (Tr. 220–24).  Dr. Bielkus's answers on

the questionnaire indicated that Claimant suffers from a number of limiting symptoms, including

balance problems, poor coordination, loss of manual dexterity, weakness, numbness, tingling or

other sensory disturbance, pain, fatigue, headaches, memory problems, confusion, depression,

personality change, difficulty solving problems, problems with judgment, and speech and

communications difficulties (Tr. 220).  Dr. Bielkus's answers also noted that Claimant needs a

job where she can shift positions at will and can take unscheduled breaks, which last on average

one hour, about every 30–45 minutes (Tr. 222).  Dr. Bielkus's answers further noted that

Claimant could only lift up to 10 pounds occasionally, and her AVM-related problems (poor

concentration, anxiety, panic, and slowness to respond) restrict her from jobs that entail any level

of stress (Tr. 224).  Dr. Bielkus ended the questionnaire by noting that Claimant has severe

limitations as to the ability to concentrate, significant short term memory impairment, and

limited neuromotor function (Tr. 224).

On January 5, 2001, Claimant visited Dr. Langgut, a psychologist, for an evaluation (Tr.

435–38).  Dr. Langgut noted that Claimant suffered moderate depression and anxiety and

showed symptoms of decreased concentration, irritability, impaired decision making, and a tense

and worried affect (Tr. 437).  Dr. Langgut found the Claimant's short term memory and

immediate recall were intact, but her long term memory was slightly impaired (Tr. 437).  Her

math skills showed some limitations (Tr. 437).  Dr. Langgut wrote that Claimant's "speed of

thinking was slowed while her thought processes were characterized by average coherence and a normal level of suggestibility." (Tr. 438). He noted that Claimant's comprehension problems were evident throughout the examination (Tr. 435).

On January 22, 2001, Claimant underwent an angiogram at the request of Dr. Ausman (Tr. 326–27). The attending radiologist, Dr. DeBrun, noted that Claimant presented neurologically intact and seizure free (Tr. 326). He found a "[c]omplete occlusion of the left parasagittal traumatic fistula[, f]usiform ectasia of the left pericallosal artery[, and b]ilateral loops of the cervical portion of the internal carotid artery with pseudoaneurysm more pronounced on the left side than on the right." (Tr. 327).

On February 26, 2001, Dr. Ausman wrote that Claimant had a pseudoaneurysm of her left internal carotid artery that needed a resecting, a major surgery (Tr. 509). For a second opinion, Claimant visited Dr. Perry at the Monroe Clinic on March 21, 2001 (Tr. 330–32). Dr. Perry noted that Claimant had suffered two seizures secondary to her AVM, and that she had suffered a spell of right facial and arm numbness that was characterized as a seizure at the time, but could have been a transient ischemic attack secondary to the pseudoaneurysms (Tr. 330–31).

Claimant opted to proceed with the surgery, and it was conducted without complication on June 5, 2001 (Tr. 413). An MRI on June 7, 2001 showed only expected postsurgical changes (Tr. 417).

On March 13, 2002, Claimant had a clonic seizure for several minutes, during which she bit her tongue (Tr. 423). She visited Dr. Perry the next day, and told him that she had reduced her medication on her own (Tr. 423). Dr. Perry readjusted her medication (Tr. 423).

After the ALJ's unfavorable decision, dated November 29, 2002, Claimant's attorney

referred her to a vocational expert, Ms. Marino, for a vocational evaluation (Tr. 524–33). Ms. Marino conducted the evaluation on January 7, 2003 and issued a report (Tr. 524, 583–87). The evaluation indicated that Claimant may have difficulty performing simple motor activities related to work (Tr. 527–28). Claimant may also have restrictions in physical stamina for lifting or prolonged standing, the ability to stand up to stressful situations, the ability to travel independently, and the ability to handle living arrangements independently (Tr. 529–30). Ms. Marino also reported that Claimant may have emotional problems, such as impulsivity, anxiety, depression, and self concept and reality disorientation (Tr. 530). Ultimately, Ms. Marino found Claimant "unable to maintain supportive [or] competitive employment at the [time of the evaluation.]" (Tr. 532).

On April 22, 2004, Claimant had a medication review at the Crusader Clinic in Rockford, Illinois, where Dr. Phillpots attended to her (Tr. 672). The RN noted that Claimant was still on her seizure medication, her condition was stable, and she had not had a seizure since March 2002 (Tr. 672). On May 21, 2004, Claimant again reported that her seizure condition was stable (Tr. 671). But, in a follow-up visit on July 21, 2004, Claimant reported she had suffered a petit mal seizure that week (Tr. 670). She also began complaining of hip pain and generalized discomfort (Tr. 670).

On October 14, 2004, Claimant visited Dr. Szachnowski at the Monroe Clinic complaining that she had been experiencing thoracic and cervical pain for the past couple of months (Tr. 724–25). Dr. Szachnowski ordered x-rays and tests, which initially revealed

cervical spondylosis[3] (Tr. 740). Claimant returned to Dr. Szachnowski on October 27, 2004, and he diagnosed her with multilevel degenerative disk disease of the cervical spine with osteophytes (Tr. 723). He recommended Claimant take Aleve and attend physical therapy sessions (Tr. 723). Claimant attended physical therapy from November 3, 2004 to November 26, 2004, after which all her physical therapy goals were met, and no functional limitations were reported (Tr. 709).

Dr. Phillpots referred Claimant to Dr. Khan for a neurological consultation, which took place on November 17, 2004 (Tr. 659). Claimant reported that she had not had a seizure since she was put on Lamictal two years prior (Tr. 657). Dr. Khan ordered an MRI, carotid duplex, and transcranial dopler ultrasound angiogram (Tr. 657). After the tests, Claimant returned to Dr. Khan for a follow up visit on November 30, 2004 (Tr. 657). At that time, she reported having left side facial numbness and "absence" daily seizures[4] (Tr. 656). But, after evaluating the results of the tests, Dr. Khan wrote that Claimant's epilepsy was stable on Lamictal (Tr. 655). The carotid duplex did show turbulence, for which Dr. Khan prescribed Plavix (Tr. 655).

On January 6, 2005, Claimant's daughter filled out a second Seizure Description Form (Tr. 633). On the form, Claimant's daughter wrote that she witnessed Claimant have two to three seizures per day on good days, and five to ten seizures per day on bad days (Tr. 633). She wrote that she had witnessed Claimant have hundreds of seizure episodes (Tr. 633). Claimant's daughter reported that during a typical seizure, Claimant would lose consciousness for 30

---

[3]"'Cervical spondylosis' is a general term for age-related wear and tear affecting the joints in [the] neck." Cervical Spondylosis, MayoClinic.com, http://www.mayoclinic.com/health/cervical-spondylosis/DS00697 (last visited Jan. 29, 2009).

[4]"Absence seizure" is another term for a petit mal seizure. Absence Seizure, MayoClinic.com, http://www.mayoclinic.com/health/petit-mal-seizure/DS00216 (last visited Jan. 27, 2009).

seconds and "just sit[]."  (Tr. 633).  Claimant's daughter indicated that Claimant did not receive advanced warnings of impending seizures, did not bite her tongue, did not lose bladder or bowel control, had not been injured during a seizure, and did not realize that she had suffered a seizure immediately following the episode (Tr. 633).

Medical records from the Crusader Clinic dated March 24, 2005 indicated that Claimant was not taking the Plavix as directed because she did not feel good after taking it (Tr. 669).  On August 31, 2005, Claimant reported to the Crusader Clinic that she had been taking Lamictal and had no episodes of seizures (Tr. 666).

On January 12, 2006, Claimant returned to Dr. Khan (Tr. 651).  At that time, she reported having had "about two" seizures within the previous year and a half (Tr. 651).  She denied headaches, blurred or double vision, nausea or vomiting, or any bowel, bladder, or balance problems (Tr. 651).  She did complain of some pain in her neck (Tr. 651).  Upon evaluation, Dr. Khan assessed that Claimant's memory, speech, and language functions were normal (Tr. 652). Her strength, tone, and gait were also normal (Tr. 653).  Ultimately, Dr. Khan wrote that Claimant's epilepsy was still "relatively" stable on Lamictal (Tr. 654–55).

In preparation for the 2006 hearing, Claimant submitted a number of forms, including an Activities of Daily Living Questionnaire and an Activities of Daily Living Questionnaire for Physical Impairments (Tr. 687–93).  In the Activities of Daily Living Questionnaire, Claimant described that she did household chores once a week and went shopping once or twice a week, usually with her daughter (Tr. 687).  She wrote that she had problems concentrating or thinking, and that she sometimes forgot what she was doing (Tr. 688).  She further noted that she had petite mal seizures two to three times per day, and five to ten times per day on bad days (Tr.

688).  She noted that she left home once per week, and that although she could leave home alone, she usually left with her daughter, who was more comfortable driving (Tr. 689).  Claimant described that she woke up several times per night (Tr. 689).  She also wrote that she used to drive, go to the park, go to church, and go out to eat a few times per week, but that she does not do those things any more (Tr. 690).

In the Activities of Daily Living Questionnaire for Physical Impairments, Claimant wrote that she had difficulties preparing simple meals because she could not use a can opener and lacked the strength to open jars or bottles (Tr. 691).  She also noted that she had difficulties opening cereal boxes or doing any of the following repetitive activities: turning the pages of a newspaper or book, filing papers, dialing the phone, picking up a coin, or using a pen or pencil (Tr. 691).  She wrote that she had a hard time shampooing and brushing her teeth, but that she compensated well to accomplish the tasks (Tr. 691).  She also wrote that she had a hard time reaching above her head, getting up from low sitting objects, going up and down stairs, or sitting for two hour time periods (Tr. 692).  When doing activities, Claimant described that she must take frequent rests (Tr. 692–93).

Also in preparation for the 2006 hearing, Claimant's daughter filled out a function report regarding Claimant (Tr. 694–701).  In the report, Claimant's daughter reiterated Claimant's difficulties doing household work and sleeping, but further noted that Claimant handles her own finances with some help (Tr. 695–98).  She wrote that Claimant's limitations cause her to be weaker, slower, and less alert, and require her to lay down during the day (Tr. 699).  She also wrote that Claimant has "little seizures" two to three times per day and up to five to ten times per day, that she does not finish what she starts because she falls asleep, that she needs help with

written and spoke instructions, and that she handles stress and changes to routine poorly (Tr. 699–700).

At the 2006 hearing, Claimant testified that the last grand mal seizure she experienced was in March 2002 (Tr. 781). She testified that she suffered petit mal seizures every day, up to five per day, where she would stare into space and not respond to those around her for up to a minute (Tr. 779–80, 783). Claimant explained to the ALJ that Dr. Perry told her to take two seizure medications, Lamictal and Neurontin, but that they were expensive and that she had stopped buying the Neurontin (Tr. 784). She also admitted that she had not told Dr. Khan that she was previously prescribed Neurontin, and that her seizures began to occur more frequently when she stopped taking it (Tr. 784). Claimant further testified that she had problems with her short term memory (Tr. 786).

Claimant's daughter testified at the 2006 hearing that Claimant suffered two or three petit mal seizures per day, and sometimes over five (Tr. 804). She described these seizures as Claimant staring blankly into space and not responding to her questions (Tr. 804, 807–08). She also testified that the frequency of the seizures increased in the latter part of 2004 (Tr. 808).

## V.     Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner.

*Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2)

whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VII. Analysis

### A. Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that Claimant had "not engaged in substantial gainful activity at any time relevant to this decision." (Tr. 560). Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B. Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe

impairment.[5]  A severe impairment is one which significantly limits the claimant's physical or

mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age,

education, and work experience are not considered in making a Step Two severity determination.

20 C.F.R. § 404.1520(c).  If the claimant suffers a severe impairment, then the inquiry moves on

to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ noted that on or before the

onset date, Claimant had the following impairments: a seizure disorder; asthma; a fracture of the

left ankle; status post repair of arteriovenous fistula; pseudoaneurysms on the right and left;

degenerative disease of the spine; depression; and anxiety (Tr. 560).  Because these medically

determinable conditions significantly limited Claimant's ability to perform basic work activity,

the ALJ recognized these impairments as "severe impairments" under 20 C.F.R. § 404.1520(c).

Neither party disputes this determination.  Thus, the ALJ's Step Two determination is affirmed.

## C.    Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404,

subpt. P, app. 1.  The listings describe, for each of the body's major systems, impairments which

are considered severe enough per se to prevent a person from doing any significant gainful

activity.  20 C.F.R. § 404.1525(a).  The listings streamline the decision process by identifying

certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*, 476 U.S.

467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to a

---

[5] The claimant need not specify a single disabling impairment, as the Commissioner will consider combinations of impairments.  *See, e.g.*, 20 C.F.R. § 404.1520(c).  To simplify, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

The court's 2004 Order instructed the ALJ to reconsider whether Claimant's petit mal seizures meet or equal the listings.[6]  The ALJ's 2006 Opinion found that Claimant does not have an impairment or combination of impairments that meet any of the listing provisions, including section 11.03, which sets forth the elements for nonconvulsive seizures (Tr. 560).  Section 11.03 states the following:

> Epilepsy -- nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. pt. 404, subpt. P, app. 1, sec. 11.03 (2008).

Although doctors routinely described Claimant as suffering from an epileptic disorder (*e.g.* Tr. 210, 444, 645–55, 672), there was substantial evidence in the record indicating that Claimant did not have seizure activity more frequently than once a week after at least three months of prescribed treatment.  The records are inconsistent as to the frequency of Claimant's seizure episodes, and Claimant reported on several occasions to having re-adjusted her own medication, thereby not adhering to prescribed treatment.

On April 22, 2004 and May 21, 2004, Claimant reported to Dr. Phillpots that her seizure condition was stable (Tr. 671, 672).  On July 21, 2004, Claimant reported to Dr. Phillpots that

---

[6]Some of the terminology used in section 11.00 *et seq* has been slightly amended since the court's 2004 Order.  For example, what the listings previously referred to as "convulsive disorder" now is referred to as "epilepsy."  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 11.00(A) (2008).  Aside from a few terminological changes, the listings remain substantially the same. This court will use the same terminology used in the current listings.

she had suffered a petit mal seizure that week (Tr. 670). On November 17, 2004, Claimant told Dr. Khan that she had not suffered a seizure since she was put on Lamictal two years prior (Tr. 657). But, in her next visit on November 30, 2004, Claimant told Dr. Khan that she had daily petit mal seizures (Tr. 656). After evaluating Claimant's test results, though, Dr. Khan assessed that Claimant's epilepsy was stable on Lamictal (Tr. 655).

The form that Claimant's daughter filled out on January 6, 2005 indicated that Claimant was suffering multiple seizures a day (up to ten on some days) (Tr. 633). But, on August 31, 2005, Claimant visited the Crusader Clinic and reported that she had been taking Lamictal and had been seizure free (Tr. 666). Then, on January 12, 2006, Claimant visited Dr. Khan and reported only "about two" seizures over the last year and half (Tr. 651). Dr. Khan again assessed Claimant's epilepsy as stable (Tr. 654–55). Before the hearing on February 6, 2006, Claimant's daughter filled out a form and again reported that Claimant suffered petit mal seizures up to ten times per day (Tr. 699–700), and Claimant claimed the same at the hearing (Tr. 779–80, 783).

As for her prescribed medications, Claimant told Dr. Perry on March 14, 2002, the day after her last grand mal seizure, that she had reduced her own medications (Tr. 422). On March 24, 2005, Claimant admitted that she had stopped taking the prescribed Plavix medications (although this is not a seizure medication, it is evidence of her willingness to self-adjust) (Tr. 669). Claimant also admitted at the hearing that Dr. Perry had prescribed her both Lamictal and Neurontin, but she had only been taking Lamictal, a fact of which Dr. Khan was unaware (Tr. 784). Importantly, Claimant indicated that her seizures occurred with more frequency when she stopped taking Neurontin (Tr. 784).

The evidence supports the finding that Claimant does not meet or equal section 11.03 of

the listings because she has not suffered petit mal seizures every week in spite of three months of prescribed treatment. The records of Claimant's treating physicians are inconsistent with the accounts of Claimant and her daughter at the hearing; Claimant and her daughter testified that the seizures are occurring with much more regularity than the reports of Claimant's physicians would seem to suggest. In addition, the evidence suggests that Claimant has not adhered to the prescribed treatment required by the listing. The record is flush with instances of Claimant admitting that she self-adjusts her medication for financial reasons or in response to unwanted side effects, and that the occurrence of seizures tends to rise when she lowers her own medication. The ALJ's decision that Claimant does not satisfy the requirements of section 11.03 of the listings, either because the records of Claimant's treating physicians indicate that Claimant is not suffering seizures with the required frequency, or because Claimant is not adhering to prescribed treatment, is supported by substantial evidence in the record.

Claimant also argues that she meets or equals listing section 12.02, organic brain disorders. Section 12.02 requires, first, that there be "[p]yschological behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests [must] demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.02 (2008). Claimant argues that she was diagnosed with a "'giant' AVM for which she required two craniotomy surgeries," and that the AVM and its subsequent surgeries caused cognitive impairments rising to the level of severity contemplated by section 12.02.

There is evidence in the record that Claimant may suffer some psychological behavioral

abnormalities.[7]  On December 20, 2000, Dr. Bielkus answered a Stroke Residual Functional

Capacity Questionnaire indicating that Claimant suffered from a number of impairments:

depression, confusion, personality change, difficulty solving problems, memory problems, and

problems with judgment (Tr. 220).  Again, on January 5, 2001, Dr. Langgut wrote that Claimant

suffered from depression and anxiety, showed symptoms of decreased concentration, irritability,

impaired decision making, and tense and worried affect (Tr. 437).  Then, on January 7, 2003, Dr.

Marino reported that Claimant may have emotional problems, and may suffer from impulsivity,

depression, and self concept and reality disorientation (Tr. 530).

    But, there is not substantial evidence in the record that Claimant meets or equals the

requirements set forth in section 12.02.  The record must contain evidence of "[h]istory and [a]

physical examination or laboratory tests" which suggests that a specific organic factor is

etiologically related to Claimant's alleged cognitive difficulties.  The evidence shows that

Claimant's AVM was "completely obliterate[d]" by November 30, 1999 (Tr. 235).  After that

date, there are no reported physical examinations or laboratory tests in the record suggesting an

etiological link between the past presence of the AVM and Claimant's current cognitive

difficulties, as section 12.02 requires.   The ALJ did not specifically address the merits of

Claimant's claim as they relate to section 12.02, presumably because no evidence existed to even

satisfy the first part of the listing.  Inasmuch, the ALJ did not err in summarily finding that

Claimant did not meet or equal listing section 12.02.

    Neither party objects to the ALJ's finding that Claimant did not meet or medically equal

the level of severity contemplated for any other impairment listed in 20 C.F.R. pt. 404, subpt. P,

_____

    [7]As discussed below, though, the evidence regarding Claimant's cognitive impairments is
inconsistent, and the ALJ did not err in giving it little weight.

app. 1.

The court affirms the ALJ's step three determination.

**D.      Step Four: Is the Claimant Capable of Performing Work Which the Claimant**

**Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional

capacity ("RFC") allows the claimant to return to past relevant work.  Residual functional

capacity is a measure of the abilities which the claimant retains despite his or her impairment.

20 C.F.R. § 404.1545(a).  The RFC assessment is based upon all of the relevant evidence,

including objective medical evidence, treatment, physicians' opinions and observations, and the

claimant's own statements about her limitations.  *Id.*  Although medical opinions bear strongly

upon the determination of RFC, they are not conclusive; the determination is left to the

Commissioner who must resolve any discrepancies in the evidence and base a decision upon the

record as a whole.  20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th

Cir. 1995).  Past relevant work is work previously performed by the claimant that constituted

substantial gainful activity and satisfied certain durational and recency requirements.  20 C.F.R.

§ 404.1565(a); Social Security Ruling 82-62.  If the claimant's RFC allows her to return to past

relevant work, the claimant will not be found disabled; if the claimant is not able to return to past

relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ found that Claimant's medically

determinable impairments result in the following RFC and preclude the following work-related

activities:

> lifting/carrying up to 10 pounds more than occasionally, and lifting lighter items,
> such as small hand tools and individual case files more than frequently; standing

and/or walking for more than a combined total of two hours in an eight-hour day, or for longer than 15 minutes, continuously, without being able to sit for one to two minutes; sitting with normal breaks, for more than six hours in an eight-hour workday; the claimant may not climb ladders, ropes, or scaffolds; but, the claimant may otherwise climb ramps and/or stairs, balance, stoop, kneel, crouch, or crawl no more than occasionally; the claimant must avoid concentrated exposure, in the workplace, to the following allergens: pollen, molds, and dog and cat hair; the claimant must avoid concentrated exposure, in the workplace, to extremes of heat, cold, and humidity, and must avoid concentrated exposure, in the workplace, to fumes, orders [*sic*], dust, gases, and other pulmonary irritants; the claimant must avoid exposure to hazards, such as exposed-unprotected heights, excavations, and dangerous machinery; the claimant may not drive a motor vehicle in the performance of assigned duties; the claimant does not possess the capacity to recall, and carry out complex or detailed instructions or to maintain such extended attention and concentration, as is required for the performance of complex or detailed tasks at a sustained workmanlike pace, but retains the capacity to understand, recall, and carry out short simple instructions, and to focus upon, attend to, and carry out simple tasks at a sustained workmanlike pace; and the claimant may not perform work which requires more than minimal use of basic math.

(Tr. 547). This is the exact same RFC determination that the ALJ made in his 2002 Opinion (*see* Tr. 27). This court's 2004 Order affirmed the ALJ's 2002 RFC determination based on the evidence that was available to the ALJ at the time he issued his 2002 Opinion, but recommended on remand that the ALJ reconsider the RFC in light of the evidence that had since surfaced (Tr. 599). Specifically, the court directed the ALJ's attention to Ms. Marino's 2003 evaluation (Tr. 598–98).

Ms. Marino reported that Claimant may have difficulty performing simple motor activities related to work, may have restrictions in physical stamina for lifting or standing, and may have restrictions in the ability to handle stress (Tr. 527–30). Ms. Marino also reported that Claimant may have emotional problems, such as impulsivity, anxiety, depression, and self concept and reality disorientation (Tr. 530).

The ALJ addressed Marino's evaluation, and ultimately concluded that although the

testing methodology was sound, the results were anomalous to previous and subsequent medical records (Tr. 556–57).  The ALJ noted that there were no ongoing records of problems with gross/fine manipulation, balance, and coordination as reported by Marino (Tr. 557).  Also, the record lacked ongoing evidence of emotional problems such as impatience, distractibility, low frustration, worry, agitation, inattention, depression, despair, and thought fragmentation (Tr. 557).  The ALJ emphasized that records from the Crusader Clinic, dating after Marino's evaluation, "denied any mental illness and no physical examination was performed.  Anxiety was noted, without identification of symptoms."  (Tr. 557).  The ALJ further discussed the extent to which Claimant's 2004 physical therapy sessions' goals were met, and that there were no reported functional limitations at the completion of the sessions (Tr. 558).  The physical therapy records also noted that Claimant exhibited no emotional concerns and that her mental status was normal (Tr. 558).  The ALJ also accounted for Dr. Khan's January 2006 assessment that Claimant's memory, speech, and language functions, strength, tone, and gait were normal (Tr. 652–53).  Ultimately, the ALJ found that Ms. Marino's "report is somewhat anomalous and may not be deemed dispositive regarding the overall period in issue" (Tr. 557).

The ALJ cited portions of the record dated both pre-evaluation and post-evaluation that are inconsistent with the findings in Dr. Marino's evaluation.  The ALJ drew a logical bridge from those inconsistencies in the record to his determination.  The magistrate judge may not overturn the decision of the ALJ just because he would have given Dr. Marino's evaluation more weight.

Claimant also argues that the ALJ erred in not giving Dr. Bielkus's December 20, 2000 questionnaire controlling weight.  Pl's Brief at 4.  Generally, the Commissioner should give

controlling weight to a treating physician's determinations when the physician's findings are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the claimant's] case record[.]" 20 C.F.R. § 404.1527(d)(2). "The treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of time, but it may also be unreliable if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability.'" *Ketelboeter v. Astrue*, No. 07-3272, slip op. at 8–9 (7th Cir. Dec. 15, 2008) (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)). When the Commissioner does not give the treating physician's findings controlling weight, the Commissioner must apply the following factors to determine the proper weight to give: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the amount of support the treating physician offers for his or her opinion, and any other factors which may support or contradict the opinion. 20 C.F.R. §§ 1527(d)(2)–(3); 1527(d)(6). "[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter*, No. 07-3272, slip op. at 9.

The ALJ observed that Dr. Bielkus's questionnaire described symptoms and limitations "not reported or suggested in the doctor's treatment records and . . . not suggested on any basis or continuing basis in the overall preceding record of treatment or evaluation" (Tr. 555). Indeed, Dr. Bielkus's questionnaire indicated that Claimant experienced a number of limiting symptoms including balance problems, poor coordination, loss of manual dexterity, weakness, numbness, tingling or other sensory disturbance, pain, fatigue, headaches, memory problems, confusion, depression, personality change, difficulty solving problems, problems with judgment, and speech

and communications difficulties (Tr. 220). Dr. Bielkus's questionnaire also noted that Claimant needs a job where she can shift positions at will and can take unscheduled breaks, which last on average one hour, about every 30–45 minutes (Tr. 222). Dr. Bielkus's answers further noted that Claimant could only lift up to 10 pounds occasionally, and that she cannot work a job that entails any level of stress (Tr. 224). Dr. Bielkus ends the questionnaire by noting that Claimant has severe limitations as to the ability to concentrate, significant short term memory impairment, and limited neuromotor function (Tr. 224).

This questionnaire is contrary to the report issued by Dr. Ausman just eight months earlier, which described Claimant's movement, gross and fine motor manipulation, and mental state as normal (Tr. 209–210). The questionnaire is also inconsistent with Dr. Bielkus's own treatment records of the months leading up to the December 20, 2000 questionnaire. On June 12, 2000, Dr. Bielkus wrote,

> On examination the patient is pleasant, well-developed, well nourished white female in no acute distress. She is alert and oriented times three. Speech in intact. Cranial nerve examination two through twelve is nonfocal. On motor examination tone is normal. Strength is intact and symmetric in both upper an lower extremities. Coordination is intact to finger-finger nose. Gait is normal. The reflexes are slightly brisker on the right side with bilateral flexor toe responses. Sensory examination is intact to light touch.

(Tr. 444–45). On October 11, 2000, Claimant visited Dr. Bielkus again, who wrote about her, "On examination the patient is alert and oriented times three. Speech is intact. The cranial nerve examination two through twelve is nonfocal. There is no evidence of ataxia on finger-finger nose." (Tr. 442). Dr. Bielkus made no mention in any treatment records of any physical or emotional restrictions, and even suggested, on October 10, 2000, that Claimant attempt to reduce her medication.

On January 5, 2001, Dr. Langgut, a psychologist, recorded that Claimant may be suffering from moderate depression and anxiety, and showed symptoms of decreased concentration, irritability, impaired decision making, and tense and worried affect (Tr. 437). Dr. Langgut also noted that Claimant's long term memory was slightly impaired, but that her short term memory and immediate recall were intact (Tr. 437). Dr. Langgut found Claimant to have some comprehension problems.

While Dr. Langgut's evaluation tends to slightly corroborate Dr. Bielkus's questionnaire (although, there are still inconsistencies between the two), Dr. Bielkus's own treatment records, and the records of Dr. Ausman, are contrary to Dr. Bielkus's questionnaire. Because there were inconsistencies in the record, it was up to the ALJ to weigh the evidence. The ALJ properly considered the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the amount of support Dr. Bielkus offered for the questionnaire answers, and the other evidence which supported or contradicted the questionnaire (Tr. 555). It was under the ALJ's purview to give Dr. Bielkus's questionnaire little weight, and to give other evidence in the record more weight.[8]

The ALJ considered all the evidence in the record and wrote a detailed opinion weighing the conflicting evidence and testimony. There is substantial evidence in the record to support his findings, and he drew a logical bridge from the evidence in the record to his RFC determination. Inasmuch, the court affirms the ALJ's RFC determination. Given the RFC determination, the ALJ's conclusion that Claimant was unable to perform any past relevant work is not disputed by

---

[8]Also, contrary to Claimant's brief, the ALJ need only contact a medical source when the evidence received from that source is inadequate to determine whether the claimant is disabled. 20 C.F.R. § 404.1512(e). In this case, a conflict or ambiguity need not be resolved because substantial evidence exists in the record to make a finding of not disabled.

either party and is affirmed.  Accordingly, the analysis proceeds to Step Five.

**E.      Step Five: Does Any Other Work Exist  in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

At step five, the Commissioner determines whether the claimant's RFC and vocational factors allow the claimant to perform any job which exists in the national economy in significant numbers.  20 C.F.R. § 404.1560(c).  The burden is on the Commissioner to provide evidence that demonstrates that other work exists.  20 C.F.R. § 404.1560(c)(2).  A vocational expert's testimony can satisfy the Commissioner's burden if it is reliable.  *Overman v. Astrue*, 546 F.3d 456, 2008 U.S. App. LEXIS 21016, at *18 (7th Cir. 2008).

Mr. Yep, a vocational expert in this case, testified that a person with Claimant's RFC and vocational history could perform the requirements of the occupations assembler and sorter, and that 13,098 and 4,891 of these occupations existed in Illinois, respectively  (Tr. 813).  Claimant argues that the ALJ failed to adequately consider Ms. Marino's report, where she found that Claimant was unable to maintain supportive or competitive employment (Tr. 532).  But, Ms. Marino's vocational evaluation was based on determinations that were contrary to other evidence in the record, and to which the ALJ ultimately gave little weight (Tr. 557).  As stated above, the ALJ properly considered Ms. Marino's report when determining Claimant's RFC.  The ALJ proceeded to ask Mr. Yep if jobs existed in significant numbers in the national economy for someone with Claimant's particular RFC, age, education, and work experience, to which Mr. Yep answered in the affirmative.  The ALJ relied on the vocational expert's finding and determined that a finding of "not disabled" was appropriate (Tr. 561).  The court affirms this

decision.

**VIII.        Conclusion**

For the forgoing reasons, the Commissioner's motion for summary judgment is granted

and Claimant's motion for summary judgment is denied.


**E N T E R:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: February 10, 2009